V. Gonzalez-Ramirez May it please the Honorable Court, good morning. My name is Ralph Metrick. I'm a lawyer from Chicago and I have the privilege of representing Mr. Gonzalez-Ramirez. Distinguished members of this panel, this Court, this case is about, is really investigatory but not inventory. The law in the state of Washington requires that if a person is seized for a traffic stop and that the driver does not have a valid license for whatever reason, the officer then is compelled by case law and by statute to find an alternative to impoundment. And here this officer, I respectfully would assert and submit to this Court that Officer Rutherford, the Washington State Trooper, did neither. He did not even inquire from the passenger whether or not she had a valid driver's license. Where was the car impounded? The car was, Your Honor, the car after it was seized and both the driver and the passenger were removed from the car, the car was then taken to a gas station. I'm sorry, it might have been to the trooper's barracks or a gas station. But what happened there is that there was a drug dog, it was towed, and there was a … It was parked at a gas station? It was either at a gas station or at, I believe it was a gas station. But at that … Under police control? It was under police control. It was at, I'm sorry, Your Honor, let me back up. It was not a gas station. It was the towing service garage. And there at the … In the garage? Outside the garage. Outside the garage. Outside the garage on … Fenced? I don't know, Your Honor. Have lock? I don't know. The point is … Was it important? I don't believe it would be relevant, Your Honor. There's a distinction going in the air about dog sniffs. Well … Whether it's in a public place or whether it's in a private place. Well, Your Honor, it was on a private place. But the point is, in this case, I would respectfully submit to you that there was a dog sniff that took place right away. So the officer's conduct, his own actions belie his conduct, that he never even sought an alternative in this case. He never sought an alternative driver. He immediately called for the drug dog. And in the transcripts that were submitted here, he says he calls for a tow first, almost immediately. Then when he's talking to his brother, Trooper, in this case, before the car was removed, he also says, to quote … First he says … Long after the car was placed in that lot, private lot, did this dog sniff take place? Almost immediately. Immediately? Almost immediately. There was a drug detection. There was a canine that detected drugs on that lot. As a matter of fact, this officer says to his brother officer, no, there's two occupants. I have them in my vehicle, but I'll give you further details. I'm wanting assistance. We can go through an inventory before the tow. As a matter of fact, I don't even know what the big secret is here. The other trooper says, what's going on here? And he says, wait till you get here. Then I'll tell you. Then we'll do this search. So to answer your question, Your Honor, that canine drug … You've got to stay near the … I will. Thank you. That drug dog was on that lot almost immediately. This trooper also to the, what happened during the course of the motion to suppress, he claims that he had spoken to Mr. Ramirez inquiring about his wife, whether or not she has a license. But it just so happens, it just so happens that this conversation occurs after the tape has already been shut off. And again, his conduct, his own words belies his activities. Can I ask you a question just in terms of the … I understand what you're saying from your position as an advocate, but I also, I want you to address in terms of, it seems to me that the court made some factual findings here, that there was some dispute in the evidence in terms of what the officer testified to, what was in the officer's report, what your client's wife would have testified to. But it seems that there, there was some dispute in terms of the officer did testify that he, that she didn't have any identification. All right. And there is some testimony to the effect that that occurred before the car was impounded. Although I know that you dispute that, but I know … Your Honor. Right. And no, and I understand that. But just obviously in looking at what our standard of review is … Yes. If the court made certain factual findings, it, it would seem that the, the transcript from the hearing, let's see, I know one of the, one of the factual findings that you said was that, let's see, Gonzales-Ramirez contends that the trooper admitted at the suppression hearing that he asked Mrs. Ramirez for identification only after he was 100 percent certain that he would impound the vehicle. And that's in your opening brief. But then in looking at the transcript, it would appear that, that actually suggested the trooper Rutherford denied stating that he, he asked for I.D. after deciding to impound the vehicle. But I, I'm just seeing, I'm seeing conflicts, I guess, in the court concluded that trooper Rutherford did ask the defendant's wife for identification and that Gonzales-Ramirez indicated that she had none. And then I've got to cite to the record, then, then the court found that the trooper reasonably concluded that Mrs. Ramirez did not have a driver's license. The court further held that there was no other licensed drivers close at hand who could have removed the minivan, right? So I've got, you've got those in the record. How do you reconcile it? Yeah. Well, how do we get past things that we have to give deference to, to the trier of fact that was there, that resolved certain factual issues? I understand, Your Honor. I believe that Ornelius is the, is the standard and that there is day no overview even for factual findings by the trial court. With all due respect to the district court judge here, the district court judge ignores... I'm saying if the, if the district court heard, I produced identification before, or I mean I asked for identification before and, you know, from the trooper, then also there's evidence that the, the, the appellant said, well, no, that didn't happen. And that the appellant's wife, that, and the district court finds otherwise, that we look at that de novo? You can look at that de novo, in my opinion, under Ornelius. And also, even as the government says, it's still a clear... If I'm not looking at the witnesses' faces, I'm not, you know... I think if you looked at... I think I can answer your question, Your Honor. With, if you look at these facts in total from the totality of the circumstances, the officer's own words at the very beginning, he says, go ahead and start the tow. He was inexorably committed to searching that car. And that's why he got the drug dog at that lot. And also his own words, again, Your Honor, I can't emphasize enough his own words. The other trooper that he calls for assistance, he says, what's that? What's going on? And he says, well, I will tell you when you, when they get here, when you get here. And then he says again, no, there's two occupants. I have them in my vehicle, but I'll give you further details. If this was an ordinary traffic stop, what's the big secret? Why doesn't he go into that? And he says, I'm wanting assistance. We can do a thorough inventory before they tow. Again, he says, before they tow. Again, from the record itself, this trooper was inexorably committed. That's really more than an ordinary traffic stop. Your Honor, I'm sorry. More than an ordinary traffic stop. It was an ordinary traffic stop. It started that way. It did. And it, and there was nothing. And after that, he determined that he didn't have a vehicle coming from out of state. And you've got a driver that doesn't, that doesn't own the vehicle. But he had registration. Doesn't have a license. Valid registration. Doesn't have a license. Valid registration. Oh, Your Honor, I'm sorry. I don't mean to quarrel with the court, of course. Well, you've got a few other things going on over here. We do. But that's what the statute says. Didn't the trooper say that he ordered the tow because of the distance? Wasn't there something? No, I didn't. I don't recall that at all in the record. With all due respect, Your Honor, I don't recall that from the record. But it is an ordinary traffic stop. It's true that it develops now that the driver doesn't have a license. And of course, that's the crux of this case. That's why we're here this morning to say, if he doesn't have it, sure, he can tow it. But before he does, he has to exhaust reasonable alternatives. And I respectfully, again, would submit to this court that he did not even exercise any discretion whatsoever. That's what the case law says in this state, in the state of Washington and the statute. You have to exercise discretion. He didn't do it. It's simple. Why does it miraculously appear so? Are you familiar with the Supreme Court of Illinois? I am. Well, tell me about that case. The Cabalas case? No, the Cabalas. Yes, Your Honor. I have the proof. And again, I don't mean to be a smart-aleck. I was the lawyer that argued the case in the Illinois Supreme Court. And unfortunately, now I have to act as the respondent in the United States Supreme Court. The Cabalas case was a case where — The Supreme Court has granted certiorari? They have, Your Honor, yes. The state of Illinois had applied for certiorari and was granted. It was held in that — the Illinois held that you cannot broaden a traffic stop into a drug investigation. That is correct, Your Honor. Specific facts — Sorry. — that cause you to believe that there are drugs involved. There was none in Cabalas. He was only under — of course, under the Wren decision. The officer stopped Mr. Cabalas for only going five miles over the limit. And almost immediately after the stop, there was a drug detection dog that came on the scene. The Illinois Supreme Court said, before you do that, it is not a non-event, even though the state had argued that just bringing the dog is a non-event. After all, it's not a search, even though that may be called into question because of the Kylo decision. Isn't that — isn't that this case? It's not this case, Your Honor. It is not this case. I suppose it has — This case is not governed by Cabalas? Respectfully, it is not, Your Honor. It is — Well, that's all I wanted to know. It is not. I mean, I suppose you can turn it into — and I would — if the Court would allow me, it's not in my briefs. There was no probable cause, or I should say no reasonable suspicion, as the Illinois Supreme Court said, for bringing the dog in the first place. So they applied a Terry standard before you could even bring the dog. So to answer your question, Your Honor, if you will allow me to broaden the scope of my argument — You better move along, because you're — you're one minute and 42 seconds in the whole — I'm sorry. I went too far. I hope I answered all your questions. I think that my adversary deserves a chance. You didn't raise this in your brief, correct? Your Honor, I did not raise the Cabalas. I'm only answering His Honor's question. Thank you very much for your consideration. Mr. Court, my name is James Hargitay. I represent the United States in this matter. In response, in the supplemental excerpt of records at page 75 and 76, Your Honor, there is reference to the trooper's testimony that because of the location of the traffic stop, from his experience working the area and the distance that — Before they hauled the car away, they inventoried it. And there was not even a bit of suspicion whatsoever about any narcotics in that car. That is correct, Your Honor. All of a sudden, when the car stops at the service station or the impound lot, there's a dog. It's an impound lot — Is that — can you cite me a case that says that that's legal? Your Honor, again, that issue was not raised. I'm not prepared to do — I understand that. But can you cite me a case that says that's legal? I cannot, Your Honor. Without some research, I'd have to look at it. And just for the Court's information, it was in an impound lot, which is a standard impound lot for the Washington State Patrol. They authorize certain individuals to tow and to In this case, is the defendant narrowly — And the vehicle is fenced off. Correct, Your Honor. It is a secured lot, protected lot. Have watchdogs in there? I don't believe they have watchdogs. I believe it's manned because of under State Patrol — Washington State Patrol procedures, that lot must be manned by someone 24 hours a day. It's not that they walk out and lock the gate. The lot was a private lot. It is a private lot, contracted — Controlled, or leased, or owned, or by the police. No, Your Honor. It's under contract. They sign a contract with Washington State Patrol, Washington State Patrol takes care of it. That doesn't give them any control. They're independent contractors. Correct. I think your brief, you talk about the impound was pursuant to a written standard operating procedure. Correct, Your Honor. Is there a standard operating procedure when a trooper should turn off a videotape? Was there any — That, I'm not familiar with whether there's a time or a place where that occurs. I think the trooper's testimony was, is once the determination of the issuance of a citation is made, then they're placed in the vehicle, they turn it off. It's a forward-looking recording device, so it would record voices, but you would see no movement or anything else. But is there — also, too, on the point, is there a standard operating procedure for determining all possible alternatives to impoundment? It references the statute saying you should consider the various alternatives, and then it identifies — I believe it identifies some of the alternatives, but it references what the state law says, is you must consider it, it must be reasonable. And I think there are, in fact, specific — if the driver's arrested for this, or if the driver's just issued a citation release, you will consider this, this, and this. As the trooper indicated, you can sticker, a 24-hour sticker, if the vehicle is abandoned. We brought up questioning about that. He indicated, no, this was not an abandoned vehicle, so therefore we wouldn't sticker it. So that would be — that would be one item that would govern the impounding, is if the vehicle is abandoned by the side road. They're not impounding, they sticker for 24. If they come back in 24 and it's there, then it is impounded in inventory. But the policy of the state of Montana to have a dog sniff in all cases in which there's a — in which there's a routine traffic stop. This is the state of Washington, and no, Your Honor, I — Montana. There — I do not know of any particular policy that governs the use of the — you know, where it's written down, you will use a dog to sniff in this vehicle. What caused the police in this case, then, to call in the dog? After they had inventory of the car, they hauled it away for a long distance, and there was no suspicion that there was any narcotics in the car. Why did they do it in this case, then? Your Honor, because it wasn't on the record. I will give you facts that are not on the record, but basically what happened was during the course of this, the trooper, based upon the fact is that the defendant was from Arizona, the vehicle was registered to an individual in California — That showed narcotics. I understand that. Why does that show narcotics? You mean people from Arizona have narcotics in their car at all times? In addition to that, Your Honor, the fact is that they said they had been traveling and there was no luggage in the vehicle. Well, that's a routine traffic stop. People go fast-carry narcotics in their car? Your Honor, based on what the trooper found and the responses to the defendant, the defendant's responses and the lack of knowledge about the registered owner, about the name of friends — How much is in the record and how much isn't? — suspicion that there's narcotics in the car. Those facts. All the facts that you have. It was based upon the trooper — the entire circumstances surrounding the stop, the trooper felt that — We know. We know what it was. I mean, you've got two people in Arizona. They're driving a California car. The driver doesn't have a license, right? Correct, Your Honor. Looked at the people in the car. The woman didn't have identification, right? Am I right? Yes, Your Honor. That caused him to draw that conclusion. But that's not the — what the Court is not hearing because the Court doesn't have a full record. Had this been appealed on some issue, that issue, then this Court would have the full record. This Court would have all of the other factors which led this trooper to suspect that this vehicle  that all of the factors that this Court has identified, the driver's license — But the dog issue is not before us. That is correct, Your Honor. That was not raised. It was — merely raised was the issue of whether there was a violation of the Fourth Amendment by the district — by the trooper not inquiring whether the passenger of the stopped vehicle had a valid driver's license before impounding the car. That is the narrow issue. The dog sniff is not before us. Maybe we have incompetency of counsel. Your Honor, I believe that — This is the most important issue that can come up in that case, the dog sniff. Your Honor, I believe — I had the first dog sniff case in the Ninth Circuit when I was a district judge. And the dogs' names were Vita and Blue. I don't remember who the lawyers were. They didn't count. But I got reversed. I've been waiting for Supreme Court vindication ever since. It's been three decades. That's the first thing I thought about when I read this. Your Honor, I believe that — What was the name of the dog here? I'm just keeping track of the — I don't remember, Your Honor, because there are a couple of dogs working with the State Patrol, and I don't remember — I've had a case with this trooper, a couple of cases with this trooper, but I'm sorry, I can't remember. I have a T-shirt with his picture on it, but it doesn't list his name. And I would stand before the court, and I would — I would stand before the court and co-counsel the counsel at the table here, but they're very competent, and they did an excellent job. And I believe if they saw that issue as being an issue that would have been raised. So I'm not here to defend them, but I don't know that there's incompetent counsel based on what I saw. I think the narrow issue — and the defendant has narrowed — or the appellant has narrowed this down to — is the single fact, if you read the issue as framed by them, is whether the trooper did not inquire if the pastor had valid identification, and has indicated there's no absolutely — no indication in the video of the suppression hearing that the trooper asked. And I think that's wrong. It's incorrect, because there are factual basis throughout the record, supplemental record and the appendix to the defense brief, that the testimony was is that he did ask the passenger for identification. In Washington law, because there is no suspicion of any wrongdoing, the trooper cannot demand identification. May only ask for identification. And he did. And that — and then — He was told she had no identification. Correct. Asked her. She didn't respond. He responded. When asked again, the appellant says she doesn't have any identification. And that factual dispute was resolved in favor of the trooper by the district court. And that factual determination was made. But that is really the crux of this argument, is they are saying is that that decision by the district court to believe and to adopt the testimony of Trooper Rutherford was incorrect. And the record clearly establishes the testimony that he said I did ask. And they argue that, well, that's not on the video recording. The trooper set forth his basis. This is shut off at this point in time for this reason. And then it went on after that. I note that my time is up. All right. But let me just ask you one quick question. What does the inventory consist of? Inventory consists of just going through the — in this case, it was a van, minivan. They just go through for personal items. They will go through any open container and just — what they're looking for is jewelry, money, wallets, cash, anything that's of value. And then they will make a listing of that. And it becomes an inventory sheet so that there's no issue about what was and what was not in the vehicle when it's taken into impound. And also to protect everybody so they all know, so that if it goes to the yard and it's secure there, we know what was inside the vehicle. Thank you. Thank you. I'll give you one minute for — Thank you. First of all, I want to thank Counsel for his very gracious remarks about me. I hope there isn't a strickland issue in this case. I did narrowly draw the issue in this case because the threshold question was, I again submit that the trooper did not seek any alternatives. On top of that, Your Honor, Counsel doesn't mention — I believe one of the judges mentioned earlier to me about the stipulation. There was an agreement in the stipulation that if Mrs. Ramirez were called to testify, she would have testified — this is the government stipulating — she would have called — she would have testified that she was never asked at all for a license. And it's not any — there isn't any question that impliedly cross-examination is waived. There is an agreement by the government, clearly, and ignored by the district court judge that in this case, Mrs. Ramirez would have testified that he never asked her for a license. Your Honor, in answering your question — But her husband said she has no identification. But you also have, to rebut what the trooper said, that stipulation. And accordingly, what the husband said — He also testified differently at the hearing, too. Yes. So, you know, I guess I agree that your stipulation, it — you can't say there's no cross-examination to it. Each piece is a piece of evidence that the court's looking at. That's true. But I will leave the court with this. It is highly suspicious. Again, it just so happens that this very pertinent, this very material piece of impeachment or conversation, if you will, takes place after the tape is conveniently shut off. And I want to address one other issue. It's what counsel raised about suspicion. In this case, this was, again, an ordinary traffic stop. The fact that the plates were from out of state. Again, these are innocuous facts. And I want to quote the United States Supreme Court in a case that the Eighth Circuit just decided a few weeks ago called Perry v. United States, dealing with the exact same issue in this case, where the officer did ask for an alternate driver, and the person just walked away. And they said, if that happened, then this officer should not have impounded the car. But let me quote to you Colorado v. Bertin. And where the Supreme Court held that police may exercise discretion to impound a vehicle, quote, so long as that discretion is exercised according to standard criterion and on the basis of something other than suspicion of evidence of criminal activity. And that's what happened in this case. This was a fait accompli. This officer had made up his mind. He said it in his broadcast, and it came out during the motion to suppress. He said it, let's call for a tow. And he said it twice. And he admitted that he did it before. If you even believe him, before he asked any questions of Mr. Ramirez or Mrs. Ramirez. Again, he was inexorably committed to searching that car. That's why they brought the dogs in. He didn't want to call off the dogs in this case, and he didn't want to call off the tow in this case. For all those reasons, I appreciate this panel's attention to this matter, and I respectfully ask you to reverse the district court in this case. Thank you again. Thank you. The matter is submitted. We'll call the next matter. U.S. versus.
judges: Pregerson, Ferguson, Callahan